Case number 19-1210, Board of County Commissioners of Washington County Bureau, et al. Petitioners v. United States Department of Transportation, et al. Ms. Goldberg, Petitioner, is enrolled for the response. May it please the Court. Good morning. Good morning, Your Honor. Roy Goldberg on behalf of Petitioner of Washington County. Congress enacted the Essential Air Service Program based on its appreciation of the fact that with the deregulation of the airline industry, carriers would prefer to serve the larger airports with higher passenger traffic, which created a serious service problem for the smaller airports like Hagerstown. And it's a serious blow to a community like Hagerstown when the essential air service funding is cut off so that there's no ability to have that particular service to the community. Now, in this case, the decision to terminate EAS funding by the Department of Transportation was arbitrary and capricious, an abuse of discretion, and not supported by substantial evidence because the department denied the petition for a waiver of the tenant employment requirement without addressing the various indicia of evidence that was proffered on April 12, 2019, by Washington County for why the airport was likely to satisfy the tenant employment requirement going forward, the average fact that you would have for these ten passengers. So this is the 2019 figures, is that right, or is it also 2018? Your Honor, that's two different questions, so let me address that. It is two different questions. Right. Which is it? Well, the issue as to whether or not they use 2019 versus 2018 is an issue. I'd like to get to that in a moment because on the global issue, it's not relevant because the global issue was the most important issue before you, Your Honors, is the statutory reference that said that even if you're not meeting the ten average daily employment requirement as of the fiscal year in question, and we'll take fiscal year 2018 for that, which they did not, the petition to waive that requirement may be granted. Right, but does the agency have to grant it ad infinitum? No, of course not, Your Honor. So it says it's granted, it's granted, it's granted. We've still got problems. We're not going to grant it again. The problem in this case, there was at least four or five indicia of evidence presented for that waiver decision which were ignored. Well, the government relied primarily in denying the waiver on the juxtaposition of Hagerstown to three major airports within 80 miles. That was the factor that was given by the agency, correct. And what is involved here is a projection, a prediction of future facts, right? Correct. And we have a number of opinions who are indicating that we tend to defer heavily to an agency's prediction of future facts as opposed to historical facts. And I invite this Court to defer exactly to that if the agency considers the evidence, but here they did not consider the evidence. They didn't make that waiver. You're talking about the evidence in a waiver request. Yes. Now, although I don't know if we have a case squarely in point, but isn't it fair to conclude that a decision whether or not to grant a waiver, like a decision whether to choose a remedial step, is one in which we would have to give an agency a good deal of discretion? Well, there is some discretion, but it's not unlimited, Your Honor. And here, let me just give a classic example. The petitioners in this case presented in April 2019 an important new fact, this interline agreement, which means that basically somebody- That's my point. I asked you, was it 218 or 219? The agency says it made its decision at the time it had the 218 figures, all right? Now, that decision didn't become final until after the 2019 year when this new information was available. So as I understood most of your argument, it was that the agency was mistaken not to take in these more recent events  and you have these agreements, you have these new management, you have this new advertising effort, et cetera. Well, Your Honor, I'm glad the opportunity to clarify here because it's two separate arguments. We'd like to win on either one. We don't need both to win. I hear you, but I'm trying to get to the one that struck me. Sure. Let me be clear. One of our arguments is that by the time the agency got around to making its final decision in October of 2019, the fiscal year in question had already ended. It was FY 2019. That was our motion for reconsideration. Right. But you also make the point that its original decision did not take effect until the 2019 fiscal year, at which point these new events were in existence. Well, there's four or five different factors that the agency disregarded. I understand. Counsel, stick with me for a moment. Sure. Will you just take me through this so I understand what your argument is? Sure. The agency says, look, we took the figures into account at the time we made our decision. In fiscal 2018, we looked at the 2018 figures. We saw repeated waivers. We saw no reason to hope for anything greater in the future. But this decision didn't become effective until the 2019 fiscal year, into October, so that by that time, these new events had taken into account that you sought to have the agency consider in the waiver, in the reconsideration, and the agency didn't do it. Well, the waiver's perspective. I understand that. Counsel, stay with me. I'm trying to. I understand what your argument is about here. Let me be clear. I don't think there's even a dispute as to the timing. When the agency made their first decision in August. I know, but what I'm trying to get at is normally the agency makes a final decision. Right. And then, if you don't like it, you move for reconsideration. But the reconsideration is not a reopening, as it were, of the original decision. But your point is, here the original decision didn't even take effect until the new fiscal year. So the agency should have considered the 2019 events? Your Honor, it's a point, but it's a small point. It's not what we need to win. Let me be as clear as possible. Are you talking about the reconsideration or the waiver? I know, that's what I'm trying to get at. I'm talking about the waiver. In August 2019. You're talking about the waiver, not the reconsideration. Yes. In August 2019, the initial decision. Okay. So we're not talking about anything else. In August 2019, it wasn't that long ago, the Secretary denied the petition for waiver. The petition for waiver was filed in April of 2019. The petition for waiver said, Secretary, waive the tenant employment requirement because we're going to meet it in the future. And here's why we're going to meet it. First of all, we're already meeting it now. So it's not like we're not meeting it now, but we hope to meet it in the future. So one addition was, in this year, we're already meeting it. In fact, in December 2018 was our best December in five years. So that was one factor. The other factor was, we've been talking about this interline agreement with American Airlines, which is going to make it seamless. People can go on aa.com, Travelocity, Expedia. And we know we've talked about that before. And you've addressed that in prior waiver decisions. But guess what? In March of 2019 is when it became effective fully. So we have a new environment here. We have this great thing that we've been waiting for. And thankfully, it's finally here. We also have the Condor interline agreement. Germany's second biggest carrier. That was coming into fruition. They had 50,000. What's going on here, counsel? That's what I'm trying to understand. Why, as you say, did the agency ignore all these good new events that, from your perspective at least, showed a likely good success in the future in having the minimum number of deployments? I can't speak to why they decided this year they didn't want to fund it anymore. I can say this, though, Your Honor. The first decision in August 2019 got it wrong. They actually said, we are denying your service, your subsidy, because you failed to comply with the $200 subsidy cap. And then our petition for reconsideration said, that's not fair. The subsidy cap can apply if we actually had a better year. Wait a minute. They conceded that point. They did. Yeah. That's not relevant. Well, it's relevant to show that the agency was disposed to deny the funding here. And they found a reason it didn't work. And then they backed up on reconsideration and said, well, here's another reason why. Well, agencies do that all the time. That's true, Your Honor. But the problem here is, in this particular case, there was four or five indicia that they ignored. The only thing that's relevant to us is whether or not the decision not to grant a waiver was arbitrary and capricious. Right. And what is our scope of review of that question? Failure to consider relevant evidence under the State Farm decision gives me, I believe, a good argument there. This is a problem that I have, though, counsel, is that in response to the government arguing that this isn't reviewable because there is no standard, meaningful standard, against which we can judge the agency's decision, you say, yes, it is, and the standard of reviewability is whether the Secretary considered all of the evidence that we submitted. If that's the way that we're supposed to judge whether there's a meaningful standard, then everything an agency does is reviewable, no matter how the statute is written, because the agency is always going to be tasked with considering whatever evidence is presented to it by an applicant or anyone else. So if to get reviewability all you have to do is say the agency didn't consider all of the evidence before it and that means that this decision is reviewable, then we might as well not have that subsection of 701 because it's meaningless. Your Honor, that's an excellent question, and it's a matter of degree. Obviously, if the agency had considered various factors here, the 50,000 and the interline agreement, the Condor agreement, and maybe didn't address one of them, then obviously that would be good enough, and this Court in prior decisions has said, but in decisions I've had before this Court in arguments. So it's a case-by-case determination as to whether or not, based on the facts presented, whether or not it's reviewable at all? Well, no, I think there's two issues. In this particular case, there's a record that there were four to five arguments that were not even addressed in the decision. So that's different than another situation where you might be a nitpicker and say, well, they generally try to address almost every issue, but they forgot in their comments or in the Federal Register to address something. In this particular case, judicial review, obviously Congress knows how to say, I've had cases before, where they say the Secretary's decision is not subject to judicial review. That's the first subpart of the statute. The second part is there could be certain very limited discretionary decisions, but I think the Weyerhaeuser decision in the Supreme Court shines a light on the issue. They say, how do you have a statute that says agencies can't abuse their discretion, if then you turn around and say, but if it's a discretionary issue, it's not subject to judicial review. In this particular case, it's a pretty clear, there's a fact determination. What in the statute tells us how the Secretary is supposed to determine whether he or she is satisfied? Well, I think the issue, and I believe that was Judge Silverman's case in Connecticut, I mean, the fact that it says the Secretary's satisfaction in that case, it was the Department of Interior, I believe, does not mean that the Secretary gets full discretion. I think if it's the interest of justice, that would be a good example of where courts have said, we don't know what that is. Or maybe in the Webster case, where it was national security was at issue, if somebody had access to secure information, that would be the discretionary kind of issue. Here, we're talking about a factual determination. Is it likely that the 10 employment requirement is going to be met in the future? That's the factual determination that agencies make all the time. How are we supposed to know when that's arbitrary and capricious? This isn't like Weyerhaeuser, where there was a description of what the agency was supposed to consider in making that particular determination. There were three or four factors that were cited in the statute. Well, here we have a statute, 41713, which is the initial essential error service determination. What about the language on the waiver? The language on the waiver says that to the Secretary's satisfaction, whether or not there's likely to be the 10 employments going forward. Read it exactly. Sure, Your Honor. Because it's responsive to Judge Wilkins' question. Just one moment, Your Honor. I recall it as giving you some fact here, at least. For fiscal year 2013 and each fiscal year thereafter, the Secretary may waive on an annual basis subsection A1B with respect to a location if the location demonstrates to the Secretary's satisfaction that the reason the location averages fewer than 10 employments per day is due to a temporary decline in employments, which is a factual determination. And, Judge Wilkins, if the agency had gone into the facts and said, we've looked at this interline agreement with AA, we've looked at other airports where, you know, regional carriers said that. But that requires the Secretary to project, to make a future judgment as to whether the past situation was temporary or not. Based on the facts presented to her. That's right. So it requires the Secretary to make a factual determination as to what the future facts are. And we have cases concluding that when an agency is charged with making future factual determinations, we tend to defer to those more. Actually, it's mentioned in airbags, the famous airbags case in the Supreme Court, that those are matters on which we would defer as opposed to historical facts. I think there's deference that's certainly appropriate here. But, again, if the agency had said, we're going to look into the interline situation, how it may impact and improve employments, and then based on its discretion decided against it, then the deference might be allowable there. But here you don't even get to that point. Well, no, that's not deference. That's direct, that's searching review. But. In fact, what the agency said is, look, our projections are that Hagerstown will not be able to maintain the 10-deplaning requirement given the fact that there are three airports within 80 miles. That alone is not entitled to deference because that's not. Why? First of all, they waived it three or four times with the same factual determination. Right. So they're projecting, they're looking in the past. But they never explained that that was different. They never explained why in four decisions or three decisions the facts on the ground didn't change. You're asking for a much more searching review of a waiver determination than I think we've ever given. No, Your Honor, I'm just asking for the agency to actually consider the evidence before it. I don't know what about this case would say State Farm doesn't apply. That's what I don't. That's our issue. State Farm is not a waiver case. So your argument is that the four factors you identified are precisely the type of thing that would enhance, better enable the agency to make a future projection. And if it doesn't even acknowledge those factors, then it's just arbitrary and capricious. Because if you have an agreement, if you have this new advertising effort, et cetera, that should make a difference. Why even have a waiver provision at all if the agency ignores the petition for waiver evidence and then makes a decision based on other grounds? I mean, this is basic. They don't even try to look at the evidence before them. So whatever standard Your Honors want to give or think is appropriate, at a minimum, the agency has to at least consider the evidence that's presented, we would submit. Otherwise, why even have a waiver provision at all? Congress clearly wanted the agency to consider the employment levels and to give consideration to the petition. We're not asking for some high standard or to substitute this court's judgment for the agency or even saying that one expert is entitled to win over another or that some evidence is better than another. Nothing like that. Just a basic State Farm issue that says in denying or granting a waiver, don't ignore the evidence that's before you, which is what happened in this record. All right. Why don't we hear from Charles? Thank you. Good morning. Good morning. May it please the Court, Charles Enloe for respondents. I'd like to start by getting straight to counsel's main point, which is that the allegation that the agency ignored the evidence that was before it. That is not the case. In the waiver. Correct. So Hager's Tent submitted a waiver petition in April of 2019. It acknowledged that it was out of compliance for fiscal year 18, and it predicted that noncompliance was temporary, and it gave some reasons why it thought that was the case. The agency did not ignore that evidence. In its first decision, its final order in August 2019, it acknowledged that a waiver petition had been submitted. It summarized the arguments that Hager's Tent made in its waiver petition. It did not ignore them altogether. And then it explained the reasoning for why it was rejecting the waiver petition. And the agency gave three reasons for its denial. First, Hager's Tent had been out of compliance for five out of the six fiscal years that the tenant employment requirement had been in existence. Second, that noncompliance had continued even when Hager's Tent offered different service options to passengers. And third, Hager's Tent was located, as the court indicated, within 80 miles of three different major airports. And the department predicted on the basis of those factors that Hager's Tent would not come into sustained compliance and that the reason for its prior noncompliance was not a temporary decline in employment. Does the statute require sustained compliance? The statute requires that an applicant show to the secretary's satisfaction that the reason for the prior noncompliance was not a temporary decline in employment. So I think if you had a situation where a location was out of compliance for several years in a row, eked out compliance in one year, and then was out of compliance for several more years in a row, I think the agency could reasonably conclude then that, you know, isolated compliance doesn't show that the reason for the noncompliance is a temporary decline in employment. It's because that noncompliance is long-lasting and is not limited in time or temporary. So, and I think that this is not a case where we are asking the court to uphold the agency's decision on the basis of some new or different rationale than the one that the agency gave in the orders. You made an argument in the brief that this wasn't reviewable at all, because it was within the unbridled discretion of the secretary. But as counsel pointed out, we have a case which actually I wrote that is contrary to that, isn't it? I think it's not, Your Honor. That's the Connecticut case. I think that there's two factors that render this decision not reviewable. One is that the question that the agency had to answer was one that was subjective and a judgment call, which is whether the reason for noncompliance was temporary. That gives you a lot of, that may give you an awful lot of deference. But does it mean it's unreviewable? It wouldn't by itself, but in combination. You mean, for instance, if the agency had said in denying the waiver, is we tend to prefer Texas for political reasons over Maryland, would there be any question that that would be reviewable? I think that would be. I think that what's nonreviewable is a decision to deny a waiver based on a determination that an applicant had not shown to the secretary's satisfaction. No, no, no. The secretary says it's not shown to my satisfaction because I hate Texas. I mean, I love Texas and I hate Maryland. I think that our position is that. Wait a minute. That would be reviewable, wouldn't it? Our position is that there would be no APA claim there, but there would be perhaps a constitutional claim available. There would still be an APA claim? He's saying constitutional. I know you said there's a constitutional claim. But why wouldn't there be an APA claim? I think that by Congress saying that an applicant has to make the subjective showing to the secretary. I want to prefer traffic in Texas because it's a growing state. Maryland is a declining state. Therefore, I grant the waiver for Victoria but not for Hagerstown. Would that be reviewable? I think it would not be under the APA, but I think it's very unlikely that that situation would ever arise. Well, that's not a constitutional question. I think that's a tough question. I think you make a much better argument to suggest that there is limited review of projections into the future on the part of an agency, plus there's limited review of a waiver determination just like there is of a remedial determination. Yes, Your Honor. We make that argument, too. And I would note that if the court agrees with us on the merits, the court doesn't even need to reach the reviewability argument, which is not jurisdictional. And I think that's absolutely right. I think that the agency made a prediction about future events and examined the entire record of past noncompliance, and that the agency's determination is subject to a great deal of deference if it's reviewable at all. I'll note as well the argument that Judge Rogers was mentioning briefly at the beginning, which is this idea that because Hagerstown's eligibility was not completely terminated until October 18th of 2019, which was 18 days into fiscal year 2020, the agency was required to look at the fiscal year 19 data rather than the fiscal year 18 data. The question wasn't required, but was arbitrary and capricious not to. Well, I think that Hagerstown actually makes two separate arguments. So one is they argued that when the department was deciding whether the fiscal year 18 compliance was temporary, the department should have looked at the fiscal year 19 data. The second argument is that, no, because the statute says you look at the prior fiscal year, by the time we got to October 18th, the prior fiscal year was fiscal year 19. But, of course, the agency made its decision in August of 2019 that in the prior year, 18, Hagerstown was out of compliance and not entitled to a waiver. And the only reason we got to October 18th is because the agency allowed for an orderly shutdown of service, and their noncompliance is not excused for that reason or because they petitioned for reconsideration. As for the first argument about failure to consider that data, they raised that point on reconsideration, and the agency said two things. The agency said, first of all, Congress has charged us with looking at the prior year, which at that point was fiscal year 18, and that's what we did. People have a chance to come in. They have a chance to come in and dispute the data to explain why things are going to turn around, and so we don't need to look at partial year data that applicants lob into us on reconsideration or otherwise. The agency also said that even if the data were accurate and extended to the full year, a single year of compliance wouldn't change its conclusion that the reason for the prior noncompliance was not a temporary decline in employments. And that's consistent with the history here where there was one other instance where Hagerstown did come into compliance and they dropped immediately back down the next year. So basically the agency said because of the proximity of three airports, this is not a future prospect. Right, and I think it's not just the proximity. Well, I mean, the other things the petitioner is arguing are things that he has addressed. That's what I'm trying to focus on. So it doesn't matter what they do. They're 80 miles from three airports. As far as the agency is concerned, if you've gotten a lot of waivers in the past, they're not going to grant more. Well, I think it was the combination of the distance and the fact that when things had changed before, they didn't turn around. Oh, I know, but there's one thing. You change things because you paint the wall another color. It's another thing when you get actual agreements with airlines and you get a new marketing program. I think the agency's decision was especially reasonable because the kinds of things that Hagerstown was raising in this waiver request were very similar to the things that they raised in other years. So, for example, in fiscal year 17, the prior year when they asked for a waiver, Hagerstown said Southern Airlines has had reliability problems. There's a pilot shortage due to a 2013 FAA rule. They've turned that around. They now have a full supply of pilots, and our completion rate is at 99%. Fiscal year 18, still not into compliance, and they said, okay, we've had reliability problems, but look, now they have a full supply of pilots, and our completion rate is at 99% or close to 100%. I think it was reasonable for the agency to say, look, you've made these predictions in the past. Circumstances on the ground have changed. That hasn't turned around, and we think that that shows that the proximity to three airports is going to make it very hard for you to recover employments on a going-forward basis. But I would note that there are, in the program, there are, out of the about 40 airports or locations that are subject to the time employment requirement, there have been, over the course of the time that that requirement has been in place, there have been five that are located within 80 miles of at least one hub airport, and two of those locations have had no trouble meeting the employment requirement and are still in the program. The other three have had trouble and are out. So the location alone isn't enough, but in combination with the sustained noncompliance and the fact that changes on the ground weren't changing that compliance. I'd like to go back to something you said a couple of minutes ago. You said that the issue of whether this is committed to agency discretion by law is not jurisdictional. I think we've said otherwise in a case called Baltimore Gas and Electric BFIR in 2001. What's your authority for why this is not jurisdictional, why that question is not jurisdictional? Why did you say that? So, Your Honor, in the case that I have for that is called Orizac v. Sullivan, 576 F3-522-2009, and I believe that the court's analysis there was that because the APA is not a jurisdiction-granted statute, the fact that something isn't reviewable under the APA is not a jurisdictional problem. 576 F3? 522. Is that the one I wrote? I don't believe so. I believe Judge Rodgers did. The other one that I did write, I can't remember the name. I think I know what you mean, but I don't remember the name either that you addressed this. You're supposed to remember. I apologize. Anything further? Unless there's further questions? Thank you. Thank you. Your Honor, I have two minutes left. Very good. Thank you, Your Honor. You have two minutes anyway. I think one crucial point on this interline agreement, and there's some back and forth here, the DOT decision does not address the implementation of the American Airlines interline agreement, and it was a game changer. I mean, it's just a huge thing to have people be able to just go online, go Travelocity, go wherever. This is a projection, right? This is a prediction. Well, it's a prediction based on a fact. Yes, of course, but it's a prediction. And the point is, is that they were told, the DOT was told in April 2019, that this agreement was fully implemented the month before, March 2019. So, yes, if the agency had come back and said, well, we don't really think that that's going to matter, then that would be a different issue. But they ignored it. Counsel said that it was addressed in the order. I know the judges will go back and see. It's not there. They make other, they talk about how far the airport is from other airports. They talk about how we've been giving you waivers in prior years other than 2016, which, by the way, there was compliance. It wasn't like this was an airport that never had compliance in 2016. They don't rely on those points that you raised besides the, it's clear that their basic reasoning is the distance. That is certainly a reason that they give. They don't give any analysis as to the traffic patterns in D.C., how long it takes somebody to get into the beltway or 270. You're asking for an awful lot in a waiver decision. Your Honor, all we're asking is for the agency to consider the evidence put before it. We don't think that's a lot, Your Honor. Now, I will also just say for the record that the interline, the fact that there's an interline isn't just some irrelevant fact that happened to be brought up. 49 UFC 41733A1C, when it talks about the essential air service program, puts a lot of congressional stock as to whether there is such an interline agreement in place. So when the airport went to the DOT and said we want a waiver, we think we're entitled to it, this interline agreement, it wasn't just taking some, you know, arbitrary issue. It was one of the core things that is part of this essential air service. It's the difference maker as to why an airport like this can continue with essential air service. And it was whatever standard could apply, whatever deference we would submit, Your Honor, in this particular case, the failure to even address that evidence was arbitrary capricious abuse of discretion and failed to meet the standard of substantial evidence in the record. Thank you. Well, let me just ask you. Sure. Counsel said in 2013, was it 2013 or 2016, your client made similar representations and that didn't last in the future. Happy to address it. 2016 was the year we actually met the requirement. So in 2018, I believe, there was an issue as to whether or not we had a waiver for 2017. And in that particular case, certainly the issue of the fact that the law changed in 2013 and pilots needed a lot more rest and training, so there was a pilot shortage, that was certainly raised as an issue there. I can't remember whether or not they at that point were saying we're working on an interline agreement. I can tell you that for five years before, there was no similar interline agreement. But I will say that, and this is maybe some of the things to be clear. So in one year, the county goes to the agency and says we're getting an interline agreement with America in place. And the evidence in the record also shows that took a while, longer than everybody wanted, and that it didn't get implemented immediately. In fact, it didn't get implemented fully until March of 2019. So all of this is in the record. And I would think it was arbitrary for the DOT just to say, well, you made that argument before, and so we're not going to consider it now, which actually is more than they did. They didn't consider it. That's the basic issue here, Your Honor, is that there's a way the agency, I imagine, could have reached the decision they did had they actually paid attention to what was submitted. But for whatever reason, in the first instance, it was irrelevant, but it shows the agency actually made an erroneous conclusion of law. And then on their second issue, which brings us here today, primarily the issue of 2018, they ignored the evidence. So whatever deferent standard. And, Your Honor, finally, Judge Rogers and I, if we were confusing on this, we have a separate issue, which we'd say we would win separately on, which is when they got around to doing the final decision, they should have looked at FY 2019. But to be clear, that is different than the waiver issue that brings us here today. Thank you. Thank you. We'll take the case under review. Thank you.
judges: Rogers, Wilkins, Silberman